# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

STEPHEN WISECUP,     :

  Plaintiff,      :
               Case No. 3:10cv00325

 vs.         :

               District Judge Timothy S. Black
MICHAEL J. ASTRUE,    :  Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,    :

  Defendant.     :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I. <u>Introduction</u>

Plaintiff Stephen Wisecup seriously injured his back in July 2002.  Surgery followed but his back pain remained.  He later developed liver problems, depression, and anxiety.  His various health problems have interfered with his ability to engage in many activities including paid employment.

On May 19, 2005, Plaintiff turned to the Social Security Administration for financial assistance by applying for Disability Insurance Benefits and Supplemental Security Income.  The Social Security Administration denied his applications based on the conclusion that he was not under a benefits-qualifying disability.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff brings the present case challenging the Social Security Administration's denial of his applications.  The case is before the Court upon Plaintiff's Statement of Errors and Amended Statement of Errors (Doc. #s 10, 15), the Commissioner's Memorandum in Opposition (Doc. #16), Plaintiff's Reply (Doc. #17), the administrative record, and the record as a whole.

Plaintiff seeks an Order remanding this matter to the Social Security Administration for payment of benefits or further proceedings.  The Commissioner asks the Court to affirm the Social Security Administration's denials of Plaintiff's applications.

II.     **Background**

    A.     **Plaintiff**

Plaintiff injured three vertebral discs in his low back on August 1, 2002.  From that date forward, according to Plaintiff, he has not been able to perform gainful work.  Given this, Plaintiff asserts he is under a "disability" within the meaning of the Social Security Act and is therefore eligible to receive Disability Insurance Benefits and Supplemental Security Income.

Plaintiff was forty-seven years old – a "younger person" in Social Security lexicon – on the date his asserted disability began.  *See* 20 C.F.R. §§404.1563(c), 416.963(c).[2]  He has a high school education.  To Plaintiff's credit he has been employed almost all his

---

[2]  The remaining citations to the Regulations will identify the pertinent DIB Regulation in 20 C.F.R. Part 404, with full knowledge of the corresponding SSI Regulation in 20 C.F.R Part 416.

adult life, roughly thirty years, including an eighteen-month period of military service, during which he earned an honorable discharge.  Since 1985, if not earlier, Plaintiff has worked in building maintenance and repair.

During a hearing held by Social Security Administrative Law Judge Daniel R. Shell, Plaintiff testified that his worst health problem was back pain, although he also had neuropathy in his elbows, liver problems, and depression.  Plaintiff explained that he injured his back when bending down to pick up an air conditioning coil.  He felt a pop in his back, then he could not straighten up.  (Tr. 630-31).

Plaintiff underwent back surgery in 2002, which relieved his pain "for a certain amount of time."  (Tr. 628).  But, according to Plaintiff, "the pain started to come back, except I'm still..., I don't feel the pain I did before the surgery."  (Tr. 628).  The pain is in his low back.  Plaintiff told the ALJ, "It varies between tingling, and then sometimes it'll throb, not a whole lot on the throbbing...."  *Id*.  He estimated that he "can probably walk six blocks."  *Id*.

Plaintiff testified that he also suffered from depression and anxiety and had difficulty concentrating.  (Tr. 633).  For instance, after reading a newspaper he could only remember about half of what he had read.  He saw psychologist Dr. Bromberg for treatment and took medications (Paxil, Busporine).  (Tr. 629).  As to his daily activities, Plaintiff mostly watched television and used the computer "a little bit."  (Tr. 633).

B.     **Medical Source Opinions**

**1.**
**Dr. Kirkwood**

Dr. Kirkwood, Plaintiff's primary care physician, completed a basic medical form in September 2005.  (Tr. 256-57).  He noted that Plaintiff had degenerative disc disease at L3-4, a bulging disc at L4-5, and depression.  Plaintiff had a reduced range of motion in his lumbar spine, and he was awaiting approval for possible back surgery.  Dr. Kirkwood observed that Plaintiff's depression was due his back impairments; he further noted that Plaintiff had difficulty sleeping and concentration and that he "worries a greater part of the time (anxiety)."  (Tr. 256).

Dr. Kirkwood believed that Plaintiff could do the following:  stand/walk one for and one-half hours out of eight and for fifteen minutes without interruption; sit for two and one-half hours out of eight for ten minutes without interruption; and lift and carry up to five pounds.  Dr. Kirkwood checked boxes indicating that Plaintiff was extremely limited in his ability to push/pull, bend, and reach.  Dr. Kirkwood noted that his assessment was consistent with Plaintiff's disease as well as his limited range of motion and accompanying pain.  Dr. Kirkwood also checked a box indicting his opinion that he expected Plaintiff's impairments to last twelve months or more.  (Tr. 257).

One month later, in October 2005, Dr. Kirkwood sent a teledictation report to the Ohio Bureau of Disability Determinations.  He explained that treatment of Plaintiff's back injury had been conservative and involved physical therapy and epidural injections.

4

He noted that Plaintiff "continues to have MRIs that reveal L3-4 and L4-5 disc degeneration and bulging/displacement.  Both disc spaces are affected and appear related to his initial injury."  (Tr. 253).  Dr. Kirkwood opined that Plaintiff could lift and carry ten pounds or less but could not push, pull, or carry any objects heavier than ten pounds.  Dr. Kirkwood estimated that Plaintiff could sit for approximately four hours at a time, after which he would need to stand and walk to relieve back pressure and pain.  And, according to Dr. Kirkwood, Plaintiff could stand or walk for one and one-half hours per day for about fifteen to thirty minutes without interruption.  (Tr. 253).  As he had a month before, Dr. Kirkwood observed that Plaintiff's injuries and chronic pain had led to depression, characterized by difficulty falling asleep and staying asleep and concentrating.  He likewise "worries the greater part of the day" and "does exhibit some anxiety."  (Tr. 254).

### 2.
### Dr. Collares and Dr. Bromberg

A psychiatrist, Dr. Collares, evaluated Plaintiff in October 2006 at the request of Plaintiff's psychotherapist, Dr. Bromberg who is a psychologist.  Dr. Collares diagnosed Plaintiff with depressive disorder and recommended continuing his mental health treatment with Dr. Bromberg as well as with his nurse practitioner and therapist.  Dr. Collares also told Plaintiff that he might benefit from a change in medication to Wellbutrin or Cymbalta.  (Tr. 445-46).

Dr. Bromberg answered interrogatories in February 2008.  (Tr. 542-54),

summarizing Plaintiff's medical problems as follows:

> Mr. Wisecup is diagnosed with Aggravation of a Pre-Existing Dysthymic Disorder ... with significant ruminative anxiety and episodes of panic.  Mr. Wisecup's former work was quite physical, and his back injury resulted in constant pain and physical limitations that prevent him from returning to his job, he lost his home and most of his possessions.  He had difficulty adapting to loss of income, loss of status, loss of identity, and he has struggled to feel hopeful about the future.  He had poor response to the first several antidepressants he was prescribed, but he is now doing pretty well on Paxil and Buspar.

(Tr. 543).  Dr. Bromberg also opined that the combination of Plaintiff's mental and physical impairments were greater than the sum of the parts.  (Tr. 543).  He explained:

> For Mr. Wisecup, his pain is a constant reminder that his former lifestyle and beloved career is no longer possible.  He is very conscientious and a bit perfectionistic about his work, and he has a strong need to help others.  His physical limitations have prevented him from quality performance of any activities, and he can no longer offer his services to be helpful to others, and these cause him to feel low self-esteem, frustration, and increased depression with hopelessness.

(Tr. 544).  Dr. Bromberg further noted in part that Plaintiff's "pain is to him a sentence into a life he does not respect (not working, taking money without working for it), and prevents him from being in the social world of being a member of a work crew that he enjoyed."  *Id*.

Dr. Bromberg checked Yes or No answers to some questions thereby indicating that Plaintiff was unable to be prompt and regular in attendance; respond appropriately to supervision, co-workers, and customary work pressures; withstand the pressure of meeting the normal standards of work activity; sustain attention and concentration to meet normal work standards; understand, remember, and carry out simple work instructions;

behave in an emotionally stable manner; relate predictably in social situations; maintain concentration and attention for extended periods; complete a normal workday and work week without interruption from psychologically and/or physically based symptoms and to perform at consistent pace without unreasonable numbers and length of rest periods; respond appropriately to changes in a routine work setting; work in coordination with, or in proximity to others without being unduly distract by them; and accept instructions and respond appropriately to criticism from supervisors.  (Tr. 545-550).

Dr. Bromberg opined that Plaintiff had a moderate restriction in his daily activities and social functioning, and he had marked deficiencies of concentration, persistence, or pace.  (Tr. 550-51).  In Dr. Bromberg's view, Plaintiff had poor to no ability to deal with the public, interact with supervisors, deal with work stress, function independently, maintain attention/concentration, and understand, remember, and carry out detailed job instructions.  (Tr. 552-53).

### 3.
### State Agency Physicians

In July 2005 Dr. Gardner, a non-examining physician, reviewed the record and completed a form for the Ohio Bureau of Disability Determinations (Ohio BDD).  (Tr. 220-27).  He checked boxes indicating that Plaintiff could occasionally lift/carry up to fifty pounds and frequently lift/carry up to twenty five pounds.  And he thought Plaintiff could stand/walk for six hours out of eight and sit for six hours out of eight.  (Tr. 221).  He explained briefly, "50 y/o male maint. tech with 12 yr education who c/o back &

Psych.  MRI shows DDD LSS.  10-7-04 Gait WNL without aids.  He has intact motor and sensory exam with normal DTR and SLR.  Pain considered."  (Tr. 221).   Dr. Gardner did not identify any other limitations on Plaintiff's work abilities, and he  noted – without explanation – that Plaintiff's symptoms were "partially credible."  (Tr. 225).  On the date Dr. Gardner reviewed the record, it did not contain any treating or examining medical source statements about Plaintiff's physical capacities.  (Tr. 222).

In November 2005 Dr. McCloud stamped his concurrence with Dr. Gardner's assessment without explanation or reference to any particular supporting medical records. (Tr. 227).

Dr. George Schulz, a psychologist, evaluated Plaintiff in July 2005, at the request of the Ohio BDD.  Dr. Schulz reported that Plaintiff was the fourth-born child in a family with eight children.  His mother died with he was fourteen.  He experienced physical and mental abuse by his father.  His father threw him out when he was sixteen.

Plaintiff married and divorced; then married again and separated.  (Tr. 228).

During his military service, Plaintiff was treated for alcohol abuse.  He still drank a twelve pack of beer everyday.  Plaintiff studied heating and air conditioning at a Community College.  (Tr. 229).  He complained of problems sleeping and feelings of anxiety and depression.  (Tr. 230-31).

Dr. Schulz diagnosed Plaintiff with alcohol dependence and anxiety disorder NOS

(not otherwise specified under DSM-IV diagnostic criteria[3]).  (Tr. 231).  He assessed Plaintiff's Global Assessment of Functioning at 59 (Tr. 232), indicating "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning...."[4]  *See* DSM-IV-TR at p. 34.

Dr. Schulz opined that Plaintiff was minimally limited in his ability to relate to others; understand, remember, and carry out instructions; and maintain attention, concentration, and perform simple repetitive tasks.  He believed Plaintiff was moderately limited in his ability to withstand the stress and pressure of work activity.  (Tr. 233).

A non-examining psychologist, Dr. Wagner, reviewed the record in July 2005 at the Ohio BDD's request.  (Tr. 236).  Dr. Wagner checked boxes on a form indicating that Plaintiff was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, respond appropriately to changes in the work setting, and complete a normal workday or workweek without interruption from psychologically based symptoms.  (Tr. 234-35).  Dr. Wagner further opined that Plaintiff had moderate restrictions in his daily living, his social functioning, and his concentration, persistence, and pace.  (Tr. 247-48).

---

[3]  Medical professionals typically evaluate a patient's mental health under the criteria found in the Diagnostic and Statistical Manual of Mental Disorders.  Its current acronym is DSM-IV-TR.

[4]  Health care clinicians perform a Global Assessment of Functioning to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Hash v. Commissioner of Social Sec.*, 309 Fed.Appx. 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.

Dr. Wagner concluded that Plaintiff was "[c]apable of simple and moderately complex routine work, that [he] is motivated to perform, at a reasonable pace, in [a] setting with regular expectations."  (Tr. 236).

## III.  Administrative Proceedings

### A.  The "Disability" Requirement

A Social Security applicant's eligibility for benefits under the DIB and SSI programs frequently hinges on whether he or she is under a "disability" within the meaning of the Social Security Act.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

The universe of benefits-qualifying disabilities is finite.  It consists of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. at 469-70; *see also Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).  A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a benefits-qualifying disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.  The ALJ's Non-Disability Decision

Plaintiff's administrative proceedings effectively ended with ALJ Shell's

conclusion, in his written decision, that Plaintiff was not under a disability and, therefore, not eligible to receive DIB or SSI.  (Tr. 12-20).  ALJ Shell reached this conclusion by employing the five-step sequential evaluation procedure mandated by Social Security Regulations.  *See Foster*, 279 F.3d at 354; *see also* 20 C.F.R. §404.1520(a)(iv).

The ALJ found in pertinent part: (1) Plaintiff's degenerative disc disease of the lumbar spine and depression constituted severe impairments; (2) he could no longer perform his past work in building maintenance and repair; and (3) a significant number of jobs existed in the national economy that he could perform.  (Tr. 14-19).

The ALJ rested his latter findings on his assessment Plaintiff's "residual functional capacity" – an obiquitous yet pithy phrase in social security law referring to a person's "remaining capacity for work" or the most he can still do despite his limitations.  20 C.F.R. § 404.1545(a)(1); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).  Plaintiff's residual functional capacity, according to the ALJ, left him able to perform to medium work – meaning he had the strength to lift up to "50 pounds at a time" and had the stamina to frequently lift or carry "objects weighing up to 25 pounds...."  20 C.F.R. §404.1567(c).  The ALJ found certain additional limitations:

> [Plaintiff] can do no repetitive twisting or bending.  He cannot work at unprotected heights or climb ladders, ropes, or scaffolding, although he is not restricted from climbing ramps or stairs.  He is restricted to simple 1 or 2 step tasks.  He is restricted to low stress work.  He cannot perform work with the public.  He cannot be subject to production quotas.  He cannot be subject to strict supervision.

(Tr. 16).  The ALJ viewed Plaintiff's testimony as not credible to the extent it conflicted

with the ALJ's assessment of Plaintiff's residual functional capacity.  (Tr. 17).

## IV.    <u>Judicial Review</u>

Judicial review determines, in part, " whether the ALJ applied the correct legal standards..."  *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec*., 478 F3d 742, 745-46 (6th Cir. 2007).  Social Security Regulations and caselaw establish those standards.

> It is an elemental principle of administrative law that agencies are
> bound to follow their own regulations....  The Supreme Court has long
> recognized that a federal agency is obliged to abide by the regulations it
> promulgates....  An agency's failure to follow its own regulations tends to
> cause unjust discrimination and deny adequate notice and consequently may
> result in a violation of an individual's constitutional right to due process.
> Where a prescribed procedure is intended to protect the interests of a party
> before the agency, even though generous beyond the requirements that bind
> such agency, that procedure must be scrupulously observed.

*Wilson*, 378 F.3d at 545 (internal citations and punctuation omitted).  One example: the Regulations requires the ALJ to provide "good reasons" for the weight placed on a treating physician's opinions.  *See* 20 C.F.R. §404.1527(d)(2); *see also Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 545 (6th Cir. 2004). "Those good reasons must be 'supported be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Cole v. Astrue*, __F.3d __, __, App. No. 09-4309 (6th Cir. 2011)(quoting in part Soc. Sec. Rul. No. 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)).

Judicial review further considers "whether the findings of the ALJ are supported by substantial evidence." *Blakley*, 581 F.3d at 406; *see Bowen*, 478 F3d at 745-46. Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).  Substantial evidence is present "if a 'reasonable mind might accept the relevant evidence as adequate to support..." the ALJ's factual findings. *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r. of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004).  The existence of substantial evidence does not depend on whether the Court disagrees or disagrees with the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead the ALJ's decision is affirmed "if his findings and inferences are reasonably drawn from the record or supported by substantial evidence even if that evidence could support a contrary decision." *Wright-Hines v. Comm'r. of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010).

"Yet, even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec.*  582 F.3d 647, 651 (6th Cir. 2009); *see Wilson*, 378 F.3d at 546-47; *see also Kalmbach v. Comm'r. of Soc. Sec.*, 2011 WL 63602 at *6 (6th Cir. 2011)("we must reverse and remand if the ALJ applied the incorrect legal standards, even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different.")

13

V.      **Discussion**

    A.      **The Parties' Main Contentions**

Plaintiff contends that the ALJ erred by rejecting the opinions of his treating

physician, Dr. Kirkwood, and by relying on the opinions of non-examining physicians for

the Ohio BDD, Drs. Gardner and McCloud.  Plaintiff emphasizes that overwhelming

evidence supports Dr. Kirkwood's opinions.

The Commissioner contends that the ALJ properly discounted Dr. Kirkwood's

opinion as inconsistent with other substantial evidence, including Dr. Kirwood's own

medical records.

    B.      **Medical Source Opinions**

Social Security Regulations and case law require ALJs to apply controlling weight

to a treating medical source's opinion when it is both well supported by medically

acceptable data and not inconsistent with other substantial evidence of record.  *See* 20

C.F.R. §404.1527(d)(2); *see also Rabbers*, 582 F.3d at 660.  If a treating medical source's

opinion is not entitled to controlling weight, it must be weighed under "a host of other

factors, including the length, frequency, nature, and extent of the treatment relationship;

the supportability and consistency of the physician's conclusions; the specialization of the

physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242.

More weight is generally given to the opinions of examining medical sources than

is given to the opinions of non-examining medical sources.  *See* 20 C.F.R.

§404.1527(d)(1).  However, the opinions of non-examining state agency medical

consultants have some value and can, under some circumstances, be given significant

weight.  This occurs because the Commissioner views nonexamining sources "as highly

qualified physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p,

1996 WL 374180 at *2.  Consequently, opinions of one-time examining physicians and

record-reviewing physicians are weighed under the same factors as treating physicians

including supportability, consistency, and specialization.  *See* 20 C.F.R. §404.1527(d),

(f); *see also* Ruling 96-6p, 1996 WL 374180  at *2-*3.

The Regulations require ALJs to "'always give good reasons in [the] notice of

determination or decision for the weight given to the claimant's treating source's

opinion."  *Blakely*, 581 F.3d at 406 (quoting in part 20 C.F.R §404.1527(d)(2)).

### C.   <u>Analysis</u>

The ALJ considered certain medical opinions when finding Plaintiff had the

physical residual functional capacity to perform medium work with limitations.  The ALJ

wrote:

> The above residual functional capacity is based on the objective
> medical evidence in the record and the physical residual functional capacity
> assessment by two state agency reviewing physicians, Edmund Gardner,
> M.D., and Jerry McCloud, M.D.  There [sic] opinions are consistent with
> the objective medical evidence in the record and are, therefore, accorded
> great weight.

(Tr. 17).  The ALJ then discounted Dr. Kirkwood's opinions as follows:

> Less weight is given to the opinion of the claimant's family physician, Dr. Kirkwood, who indicated that the claimant was extremely limited with respect to exertional and postural activities and is unemployable. Dr. Kirkwood's assessment is inconsistent with other substantial medical evidence in the record, including his own records.

(Tr. 17)(citations omitted). This was the sum total of the ALJ's reasons for rejecting Dr. Kirkwood's opinions.

Rather than providing good reasons for rejecting treating physician Dr. Kirkwood's opinions, the ALJ merely hinted at a single regulatory factor – inconsistency – without providing any meaningful insight into the inconsistencies he saw. He did not identify a single inconsistent piece of medical evidence and, although the ALJ referred to Dr. Kirkwood's own records, the ALJ did not identify an single inconsistency emerging from those records.

As noted above, the regulations require ALJs to "always give good reasons" for the weight placed on a treating physician's opinions. 20 C.F.R. §404.1528(D)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficient specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley*, 581 F.3d at 406-07 (citations omitted). By generally referring to inconsistencies in the medical evidence or the inconsistency he found in Dr. Kirkwood's records, and failing to provide any specific example or reference to evidence supporting such inconsistencies, the ALJ's decision is not sufficiently specific to make clear his reasons for rejecting Dr. Kirkwood's opinions.

16

The ALJ's decision, moreover, does not separately describe the medical evidence contained in the administrative record.  Although the Regulations may not specifically mandate a separate description of the medical records, the lack of one in the present decision casts a further shroud over the mystery of what medical evidence the ALJ believed was inconsistent with Dr. Kirkwood's opinions.  The Commissioner attempts to remove this shroud by describing specific evidence in the record.  *See* Doc. #16 at 136–41.  Yet the existence of such evidence does not reveal that the ALJ's failure to provide good reasons for rejecting Dr. Kirkwood's opinions constituted harmless error.

"A court cannot excuse the denial of a mandatory procedural requirement protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.  '[A] procedural error is not made harmless simply because the [aggrieved party] appear to have had little chance of success on the merits anyway.'  To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with §1527(d)(2), would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory."  *Wilson*, 378 F.3d at 547.  In the present case, Dr. Kirkwood's opinions were not "so patently deficient that the ALJ's could not possible credit it."  *Id*.

Moreover, the administrative record contains sufficient evidence, if accepted, to show that the ALJ's error as to Dr. Kirkwood was not harmless.  Plaintiff was evaluated for rehabilitation on October 10, 2002.  He was in physical therapy at the time, but he was

17

having increased pain as a result.  (Tr. 268).  Physical therapy records show that he had a reduced range of motion of his lumbar spine, positive straight leg raising test, diminished strength, lumbar lordosis, pelvic tilt, and kyphosis.  (Tr. 275-277).  He could sit for less than thirty minutes and stand less than thirty minutes.  (Tr. 275).  At the end of the physical therapy, he had experienced "slightly decreased postural tolerances and con't radicular symptoms."  (Tr. 272).  A November 14, 2002 lumbar MRI showed a broad based disc protrusion at L3-L4 with some caudal extension to the disc material, "a diffuse annular bulge with effacement of the ventral thecal sac" and some neural foramina narrowing bilaterally, and "a mild diffuse annular bulge" at L5-S1.  (Tr. 144).

On November 22, 2002, his rehabilitation case manager reported as a result of the abnormal MRI, he was referred to a neurosurgeon.  The manager noted, "Since additional diagnostic testing is needed and client is not medically stable to proceed with vocational rehabilitation planning at this time, we agreed that his case needs to be closed."  (Tr. 263)

Dr. Marcos Amongero, an orthopedist, saw Plaintiff on January 9, 2003.  He had positive straight leg raising test.  An MRI showed "broad-based central disc herniation at L3-4 and a mild bulge at L4-5."  (Tr. 218).  On April 29, 2003, he reported that physical therapy had helped but that it had been stopped by a Workers' Compensation evaluation and his condition was worsening.  (Tr. 217).

Plaintiff returned to physical therapy from August 20, 2003 through September 11, 2003 for his back problems.  His initial evaluation revealed positive straight leg raising tests bilaterally, decreased range of motion of his trunk, and decreased trunk strength.

18

(Tr. 152).  From July 8, 2003 through January 28, 2004, Plaintiff underwent a series of epidural steroid injections given by Dr. Townsend Smith.  (Tr. 153-162).  Examination before the first injection revealed positive straight leg raising tests, tenderness, and increased pain with range of motion testing.  (Tr. 161).

From February 2, 2004 through March 12, 2004, Plaintiff took part in a program of work  therapy at ProWork Center.  He had a reduced range of motion of his lumbar spine and decreased strength. (Tr. 189-190). It seems that the ALJ relied upon this report to find that Plaintiff could perform work activity. ("He underwent physical and vocational therapy in 2004 and attained all of his goals by the time he was discharged on March 12, 2004." (Tr. 15))  However, at discharge, the longest that Plaintiff could perform the activities was between three and half and four hours, which is, at the most part-time work, and does not support a finding that he could perform restricted medium work activity on a regular and sustained basis for eight hours a day, five days a week. (Tr. 165)

X-rays taken October 7, 2004 revealed degenerative changes and traction spurs of his lower lumbar spine.  (Tr. 216).  On examination, Plaintiff had poor range of motion. (Tr. 214).  An October 23, 2004 MRI revealed mild to moderate degenerative disc disease with mild bulging discs annulus at L3-4 and L4-5, and facet arthrosis at the lumbosacral level.  (Tr. 202).

In January 25, 2005, Dr. Amongero recommended "L3-4 and L4-5 discectomy, fusion, instrumentation, and a possible bone growth stimulator…." (Tr. 211).  Plaintiff agreed to surgery; however, he needed Worker's Compensation approval.  (Tr. 212-213)

19

Dr. Kirkwood submitted Plaintiff's treatment notes, dated December 4, 2006 through March 18, 2008.  Plaintiff was treated for his back pain.  On examinations, Plaintiff had reduced range of motion of his lumbar spine, positive straight leg raising test.  (Tr. 541) By April 25, 2007, Plaintiff was also seen for cervical disc disease as well as his lumbar disc disease.  (Tr. 539).  Plaintiff underwent a preoperative assessment for lumbar surgery on May 7, 2007.  He had diminished sensation, reduced range of motion of his lumbar spine, abnormal toe walk, abnormal heel walk, bilateral positive straight leg raising test, paraspinal muscle spasms, and paraspinal tenderness.  (Tr. 454-455).  Even after his lumbar disc surgery, he still had a reduced range of motion, positive straight leg raising test, and cervical disc disease.  (Tr. 531, 534, 536, 538, 621-22).  Dr. Kirkwood noted that Plaintiff needed a second lumbar surgery.  (Tr. 534, 536-537).

Additionally, Plaintiff also had severe cervical and upper extremities limitations. A December 21, 2001 EMG established "evidence of ulnar neuropathy at the ulnar groove on the right side."  (Tr. 209).  A May 2, 2002 EMG of his left upper extremity also showed moderate to severe ulnar neuropathy.  (Tr. 205).  Dr. Mark Klug, a hand surgeon, on February 7, 2002, noted that problems with Plaintiff's right upper arm had worsened over the previous five to six months.  On examination, he had "an extremely sensitive ulnar nerve behind the medial epicondyle," markedly positive Tinel's sign, "weakness of the flexor carpi ulnaris in the right forearm…," weakness that is rather impressive in the first dorsal interosseous and abductor digiti quinti of the right hand…, and a "moving two-point discrimination is greater than 9 mm. ulnar nerve distribution right, and it is 5-7

20

mm. left."  (Tr. 142).  Dr. Klug diagnosed "chronic ulnar neuropathy right elbow with intrinsic weakness and constant numbness."  *Id*.  And he recommended an "external neurolysis ulnar nerve of the elbow with anterior submuscular transposition."  (Tr. 143).

Turning lastly to the ALJ's reliance on non-examining, record-reviewing physicians Drs. Gardner and McCloud, the ALJ credited their opinions in a conclusory manner by referring generally to medical evidence consistent with their opinions.  The ALJ did not identify the medical evidence that he found consistent with these physicians' opinions.  And there is no indication in the ALJ's decision – by, for example, citation to the applicable regulatory factors, or better yet, some discussion of them – that he weighed these physicians' opinions under the required regulatory factors.  The Regulations instruct ALJs – no less than three times – to weigh the opinions of non-examining physicians under certain factors.  *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see* also 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions).  By not doing so, the ALJ did not apply the correct legal criteria to the opinions of Drs. Gardner and McCloud.

Accordingly, Plaintiff's Statement of Errors in well taken.[5]

_____

[5]  In light of the above review, and the resulting need for a remand of this case, an analysis of the parties' arguments concerning Plaintiff's mental limitations is unwarranted.

## VI.    <u>Remand Is Warranted</u>

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under sentence four of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

Plaintiff seeks a remand for payment of benefits.  Yet, such a remand is unwarranted because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) because due to the problems discussed above.  On remand the ALJ should be directed to apply the correct legal criteria to the evaluation of the medical source opinions and to review the evidence under the required five-step sequential evaluation procedure to determine anew whether Plaintiff was under a disability and thus eligible to receive Disability Insurance Benefits and/or Supplemental Security Income.

22

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Stephen Wisecup was under a "disability" within the meaning of the Social Security Act;

3.      This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.      The case be terminated on the docket of this Court.


July 15, 2011

                                        _____s/Sharon L. Ovington_____
                                             Sharon L. Ovington
                                        United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).